Cheryl M. VAN ALLSBURG, et al., Plaintiffs,

v.

CITY OF KANSAS CITY, MISSOURI, et al., Defendants.

No. 82–0675–CV–W–3.

United States District Court, W.D. Missouri, W.D.

Dec. 20, 1984.

Cathleen Connealy, Kansas City, Mo., for plaintiffs.

William D. Geary, Kansas City, Mo., for defendants.

## OPINION AND ORDER

ELMO B. HUNTER, District Judge.

Before the Court are cross motions for summary judgment. The parties are in agreement that there remain no undisputed facts and have submitted the case to be decided on stipulated facts.

This is an action seeking declaratory and injunctive relief. Plaintiffs are adult members of the Reproductive Rights Committee of the Kansas City Urban Chapter of the National Organization for Women, a non-commercial political group. Defendants are the City of Kansas City and the Board of Parks and Recreation Commissioners.

Plaintiffs claim that certain policies of defendants unconstitutionally prohibit the free exercise of the freedom of speech in parks within the parks and boulevard system of the City. These include restrictions on signs or other advertising, selling certain items associated with protected speech activity, and soliciting funds.

In addition to declaratory and injunctive relief plaintiffs seek damages based on the deprivation of their constitutional rights resulting from the enforcement of the challenged policies.

On June 13, 1982, City of Kansas City, Missouri, park rangers, acting in their official capacity, and in furtherance of policy, required plaintiffs to leave Loose Park because of plaintiffs' activities conducting a

bike-a-thon. Loose Park is a public park of the City of Kansas City.

The following stipulation of facts was submitted by the parties:

Prior to March 8, 1977, the Board of Parks and Recreation Commissioners' published policy was to exclude religious and political uses of parks. Following litigation, which was resolved through settlement, the Board officially deleted that exclusion. The litigation, which was filed in the Western District of Missouri, was *Taxpayers Defense League v. City of Kansas City, Missouri, et al.*, Case No. 76–CV–674–W–4.

Prior to March 8, 1977, the Board policy concerning religious and political uses of the parks read as follows:

"Parks, playgrounds and recreation facilities shall be used for park and recreation purposes. They cannot be used for religious or political purposes, nor for the solicitation of funds for any purpose other than Parks and Recreation."

The change in official Board policy, however, was not effectively communicated to all responsible city officials and employees who are charged with enforcing the Board's policies and City ordinances. Inadequate training of park rangers resulted from the dissemination of incorrect information concerning the Board's change in official policy.

After the March 8, 1977, deletion of an official policy against religious and political uses of the parks, no changes were made in the materials distributed to rangers until January, 1983, so the rangers continued to receive the old policies which prohibited political and religious uses.

The change in policy was reiterated by the Board in June, 1981, when an organization sought permission to use Loose Park for a political rally. The Board discouraged use of Loose Park because of its heavy use.

Unchanged by the litigation of 1977, and the policy change of March, 1977, was the policy to enforce the ordinances of the City as they were written.

Official Board policy was to not prohibit religious and political uses of the parks so long as all City ordinances were obeyed. Those ordinances included a prohibition on displaying any sign, including political signs, on public property; a prohibition on selling any article, whether or not the item, such as a button, bumper sticker, or T-shirt, had political content, unless the Board granted a concession contract, but the Board granted contracts only for recreational items; and a prohibition which has been interpreted by staff and officials to include signs, literature, promotion of anything including political issues unless done verbally only, and any other activities taken as a whole which promote anything.

Wearing T-shirts which display a political message such as "Abortion—A Personal Decision" and conducting a bike-a-thon with riders also wearing such T-shirts or signs was considered on June 13, 1982, to be a promotional advertising of the group and its message. Promotion within this prohibition was also considered to include distributing literature or seeking donations.

Rangers, with regard to political groups and activities, were told the following:

(a) Political groups may use the parks, but it is preferred that political activity not occur in the parks;

(b) Use of the parks to promote a political group or idea is allowed, but not preferred;

(c) Signs of any sort, political or otherwise, whether affixed to objects or persons, or hand held, or otherwise are not allowed in the parks;

(d) Sales of any object, whether commercial sales, or sale of an item with political content and message, with the idea of promoting the message are forbidden without a concession contract with the Board of Parks and Recreation Commissioners; such contracts are let only for recreational activities and items;

(e) Campaigning for a politician is forbidden if signs or literature are involved in the campaign activity, but not if only talking to individuals is involved;

(f) If a group asked to use the park for a nuclear freeze rally, for example, they would be told the City preferred they not do that in the parks; if the rally was conducted with signs, literature, or sales, the group would have been asked to cease the use of those items or leave the park;

(g) No literature may be handed out in parks;

(h) In certain parks, shelter houses may be reserved; if a political group informs the City it wishes to use the shelter for a political rally it is informed the City prefers it not use the parks for that purpose; if signs, literature or sales were involved in the rally the group would be asked to cease the activities or leave.

(i) Reservations for the use of the parks by a political group would not be made because permits are not issued for the open areas of the parks; groups may notify the Park Department that a large number of people will be in an area of the parks; groups calling to inform the Park Department of their desire to also use that area would be told of the first group's plans.

Training of the park rangers did not include differentiating between political and commercial uses of the parks. The failure of that training resulted in applications of the policies and ordinances applicable to the parks to be violative of protected activities.

Training of rangers is primarily on-the-job training with other park rangers. There exists no training manual. Review of the materials distributed to rangers (which included the incorrect statement on religious and political activities) setting forth Board policies, associating with other rangers, and asking questions of the Superintendent of Parks Management are the primary means of imparting information to rangers. Direct responsibility for training park rangers rests with the Superintendent of Parks Management as their immediate supervisor.

It cannot be said whether the change in official Board policy made March 8, 1977, was communicated to park rangers in 1977. High Park Department officials were aware of the policy change. Even if there had been communication of the change a confusing situation would have been created because the written materials were not changed.

Adding ambiguity to the training received by the rangers was the practice of Park Department staff to discourage political uses of the parks. If a political group contacted Park Department staff seeking permission to conduct a political activity at a park, permission was not granted nor was it denied. There is no permit procedure for the use of any open area of the parks, therefore, no permit could be issued.

It was not the practice to inform political groups they would not be prevented from conducting the political activity so long as the ordinances discussed above were obeyed. The practice of discouraging political uses was followed by Park Department officials and employees whose positions included discretionary decision-making and supervisory duties.

The following ordinances of the City of Kansas City were in effect on June 13, 1982, and are still part of the Code of General Ordinances of Kansas City, Missouri:

(a) § 2.1—Carrying Advertisements on Streets Or In Parks

(b) § 2.2—Placing of Signs, Banners, Etc., On Public Property

(c) § 2.3—Advertisements In Parks

(d) § 2.4—Posting Without Permission

(e) § 2.15 through § 2.29—Handbills

(f) § 10.1 through § 10.25—Charitable and Religious Solicitations

(g) § 26.14—Elections; Unlawful Use Of City Property

(h) § 26.19—Hawking or Peddling—Generally

(i) § 30.69—Displays Of Merchandise On Streets, Sidewalks

(j) § 30.71—Crowds

(k) § 30.88—Selling Articles

Copies of these ordinances are attached as an addendum to this opinion.

When considering Loose Park, an additional source of a prohibition on sales exists. The Deed of Dedication conveying Loose Park to the City includes the following restriction:

"11. No concession and/or privileges for the sale of articles of any kind within the Park shall be granted, given or sold except in or in connection with the building or buildings to be erected as aforesaid."

Park rangers working in Loose Park are given a copy of the Deed of Dedication with the restrictions.

Plaintiffs' group, the Reproductive Rights Committee of the Kansas City Chapter of the National Organization for Women, had planned a fund-raising event, a bike-a-thon. The riders had a route and had obtained pledges of money from people depending on the number of miles ridden. The route was in the vicinity of Loose Park, but did not include Loose Park unless a stop at the group's table was made.

In Loose Park part of the support group for the event set up a table as a rest and water stop for the riders entering the park.

As a means of promoting this event, the group itself, its ideas, and to help raise money, the bikers wore signs on their backs announcing the bike-for-choice event; a sign announcing the bike-a-thon was placed on the table in the park; persons sitting at the table wore T-shirts marked "Abortion—A Personal Decision"; such T-shirts were on the table available for sale; handouts, literature espousing plaintiffs' group's point of view were available on the table; and a small can was on the table for donations.

The bike-a-thon was a peaceful event, no disturbance was created. No complaints from the park users were received regarding the event. At no time did plaintiffs' activities cause a "crowd" to gather which obstructed, prevented, or hindered free passage along any street or sidewalk.

Officially, there was no procedure for plaintiffs on June 13, 1982, to get a permit to hold their event in the park since no permit was required because Board policy does not prohibit use of the parks for political purposes. The plaintiffs would not be permitted to solicit, to sell, to give out literature, or to have signs. Plaintiffs would not be allowed to give out literature and have signs at political gatherings in the parks.

Plaintiffs were told by park rangers that their event violated ordinances and park policies, and that they would have to leave. Such ordinances and policies would not allow their signs, sales, solicitation of funds, or passing out literature.

Plaintiffs, on Rangers' request, removed their signs, T-Shirts for sale, contribution can, and literature from the park. This would have left plaintiffs sitting at a table with their own T-shirts on as a rest station for their riders who also had on signs.

Even after the removal, the Rangers required plaintiffs to leave Loose Park because the plaintiffs still appeared to be an organized nonrecreational, political event. The Rangers believed that, as organized, with people sitting at a table wearing the T-shirts with signs on them, coupled with the steady arrival of the members on bikes with signs on their backs, the group was not recreational, but political, and, so organized, they were still advertising their event in violation of Park policies and ordinances.

At the request of Park Rangers, City Police arrived at Loose Park to back up the Rangers. Though no arrests or apprehensions were made by the police, plaintiffs believed that noncompliance with the request of the Rangers to leave would result in their arrest.

Plaintiffs left Loose Park, cancelling the remainder of their activities.

No out-of-pocket expenses were incurred by the plaintiffs.

Each plaintiff was damaged in the amount of $3,500.00.

*Discussion*

On August 9, 1983, this Court entered an order pursuant to matters stipulated to, which found that several of the policies as applied to non-commercial activities were violative of the First Amendment to the Constitution of the United States, and among other directions, enjoined the City from enforcing certain of its policies. The issues remaining unresolved by that order are:

(1) Whether the First Amendment prohibits defendants from prohibiting the solicitation of funds in the open areas of a public park if the soliciting is done by a political, non-commercial group; and

(2) Whether the First Amendment prohibits defendants from prohibiting the sale of items which convey a political or religious message (such as buttons, bumper stickers, etc.) or which do not convey such a message (such as a bake sale) in the open areas of a public park, if the selling is done by a political, non-commercial group.

■■■ The constitutional protection afforded the oral or written dissemination of opinion is not lost merely because materials sought to be distributed are sold rather than given away, or because contributions or gifts are solicited in the course of communicating one's beliefs or ideas. *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981). Nonetheless, the First Amendment does not guarantee the right to communicate one's views at all times and places, or in any manner that may be desired.

■■■ Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, and manner restrictions. *Clark v. Community for Creative Non-Violence,* —— U.S. ——, ——, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221, 227 (1984). Restrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

Section 67 of the Charter of the City of Kansas City provides:

No part of any park or other public ground under the supervision or control of the board of park commissioners shall be leased to any person, firm or corporation for any purpose; but the board may lease any building or parts thereof in any park for park purposes to any person undertaking to serve such purpose, and may grant concessions in a park for the sale of refreshments to the public using such park and for other park purposes, upon such terms and under such regulations as the board may prescribe.... No lease or concession shall be granted for any purpose not within the objects for which such park, squares and grounds or buildings are held by the City.... No shows or exhibitions of any character or kind shall be allowed or given for advertising purposes, or for profit, or for any private purposes in any park, ... but this shall not inhibit such musical, historical, patriotic or educational entertainments, concerts, dramatic productions, amateur athletic games, and zoological, horticultural or other proper exhibits in any park as may be provided or given by or with the approval of the board for the use, enjoyment and welfare of the public.

Section 30.88 of the ordinances of the City of Kansas City provides that "No person shall expose any articles or thing for sale in any park, boulevard, street, park road, driveway or other public grounds under the control or supervision of the board of park commissioners of the City, except pursuant to contract or permit from such board."

In an attempt to comply with the mandates of the Charter and ordinance, it is the policy of the defendants to grant permission to sell or solicit only to persons or groups contemplating a "recreational activity" and to deny permits to groups seeking to sponsor an activity not "recreational."

Defendants have no specific guidelines by which to measure a request of a person or group to conduct an activity in the park to determine whether it will be "recreational" or whether a permit will be granted. Each request is measured by the conditions existing at the time the request is made and whether the activity is believed to be a recreational activity or supportive of a recreational activity.

On June 13, 1982, the plaintiffs needed no permit to conduct a political activity in the park, but application of the above rules and policies would have precluded solicitation of funds and sales of items. Whether or not a contract or permit would have been issued to conduct a bicycle ride or race without the solicitation of funds and sales of items cannot now be determined.

■ A valid time, place, and manner regulation must be precisely drawn to serve a "significant governmental interest." *Heffron*, 452 U.S. at 649, 101 S.Ct. at 2565; *Clark v. Community for Creative Nonviolence*, 104 S.Ct. at 3069, 82 L.Ed.2d at 227. The interest asserted by defendants is that of providing a place to which urban residents can find an escape from the commercial environment of the City. Consideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved. *Heffron*, 452 U.S. at 650–51, 101 S.Ct. at 2565–66.

Defendants cite authority to the effect that a well ordered park system is an essential feature of city life, but cite no authority, stipulation, or evidence to the effect that "commercial type activity" is incompatible with a well run park system. For purposes of this opinion this Court will assume, but does not hold, that there is a significant governmental interest in excluding "commercial type activity" from parks.

The defendants' restrictions on sales and solicitations are not narrowly tailored to serve the asserted government interest. There is a total ban on "non-recreational"

solicitations and sales. The interest asserted could be served by a variety of time, place and manner restrictions. Defendants claim that the ban on solicitation and sales is in fact a restriction only on the manner of the exercise of first and fourteenth amendment rights in that there is no restriction on proselytizing or gatherings by non-recreational groups. Nonetheless, there is a total ban on a type of protected activity that is not replaced by the ability to gather and convert. It is plain that any ideological organization needs funds to remain a going concern.

■ Freedom of speech, freedom of the press and freedom of religion are available to all, not merely to those who can afford to pay their own way or to give out, free of charge, literature and propaganda. *See Murdock v. Pennsylvania*, 319 U.S. 105, 111, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943).

Defendants also claim that the restrictions on fundraising are merely reasonable place restrictions in that the ban is restricted to parks. The fact remains that the entire park system, a traditional public forum and natural outlet for the exercise of first and fourteenth amendment freedoms, has been completely eliminated as a place for exercising protected rights. There is nothing in the record concerning the availability of alternative outlets for the restricted activity. Even assuming that alternatives such as door to door canvassing, phone solicitations, and street solicitations exist in the Kansas City area, the total ban on fundraising in the park system is far too restrictive when considered in light of the end sought to be achieved.

■ The special attributes, characteristics, and functions of the Kansas City parks would not seriously be hampered by the imposition of lesser restrictions. This is evidenced by the fact that, under the current policies, pure commercial activity unassociated with ideological expression is freely allowed so long as the Board finds the activity to be supportive of recreational activity. If having a vendor sell recreation-related articles purely for personal profit is

allowed under the present policies as not unduly commercializing the parks, the Court is convinced that the nature, function, order, and beauty of parks can be preserved by restrictions significantly less onerous than a total ban on fundraising.

 A major criterion for a valid time, place and manner restriction is that the restriction may not be based upon either content or subject matter. *Heffron,* 452 U.S. at 648, 101 S.Ct. at 2564. Defendants claim that their ban on park sales and soliciting is content neutral. All ideological sales and soliciting are banned. Only "recreation related" sales are allowed.

Plaintiffs do not contend that, once a decision is made that an activity or sale is non-recreational, there is any unequal treatment based on content or purpose of the proposed activity. Rather, plaintiffs challenge the method of determining whether a proposed activity or sale is "recreational" or "non-recreational."

Although it is true, as defendants contend, that Courts give great weight to the interpretation of laws made by an agency enforcing the law, that maxim has no place here where there have been no interpretations or guidelines established to determine when an activity is "recreational" and where the challenge is made that the system and laws under which the agency would make interpretations are themselves unconstitutional as a prior restraint on constitutional rights. This is not a review of a particular application of the ordinance, but a systemic challenge.

 Under the ordinances and policies as they exist now, the Board has discretion, unfettered by the guidance or restriction of any guidelines, to determine that an organization's proposed activity is "recreation related" and the organization may therefore sell items, or that the activity is ideological and the organization is therefore prohibited from selling or soliciting.

This power to decide what is recreational on an ad hoc basis essentially gives the Board the power to approve activities that appeal to it and disapprove those that don't. It is open to precisely the kind of arbitrary action that has been condemned as inherently inconsistent with a valid time, place and manner regulation, because such discretion has the potential for becoming a means of suppressing a particular point of view. In effect, the ordinance as written and as enforced subjects the exercise of first amendment freedoms to the prior restraint of a permit without narrow, objective and definite standards to guide the licensing authority. *See Shuttlesworth v. Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162 (1969).

Defendants maintain that the term "recreational" is a term with a common meaning which does not require specific and detailed guidelines to insure that it is not applied arbitrarily. The Court is of the opinion that the term "recreation" is particularly unsuitable as a content-neutral qualification for commercial activity that may occur in parks. Many, if not most, organized "recreational" events are not mere opportunities for mindless relaxation and exercise, devoid of any ideological significance. Indeed, most of our holidays have deep ideological roots. For example, one could hardly argue that a 4th of July picnic or fireworks display is devoid of ideological significance. Nonetheless, activities of this type are easily termed "recreational." The practical effect might be to allow sales relating to ideological activities that have become enough a part of our lives and traditions to be thought of as "recreational." Less popular or less established activities are less likely to be so considered because of the unfamiliarity or novelty of their ideological component.

The record in this case makes it more than clear that the challenged ordinances and policies have the potential for becoming a means of suppressing a particular point of view. It is stipulated that plaintiffs' group, which promotes the right of a woman to choose to have an abortion, would not have been allowed to conduct a bicycle race in the park in support of its cause and sell promotional T-Shirts and buttons to raise funds. (Defendants admit

that bicycling is "recreational.") Nonetheless, a group which has among its published goals: (1) to provide a symbol of the revitalization of the City as a whole; (2) to provide further impetus to the revitalization of downtown; (3) to showcase cultural resources of Kansas City and enable those resources to gain further exposure and generate funds (e.g., the Symphony, Jazz, the Kansas City Museum, Historic Kansas City Foundation, the Kansas City Ballet, etc.); (4) to provide an educative experience about the rich history and tradition of Kansas City, the quality of its resources today and its future; (5) to develop a network of people and institutions and a sense of common direction and potency among them; and (6) to generate local, regional, and national exposure for Kansas City, was in fact permitted to sell T-Shirts, buttons, posters, and other promotional materials in order to cover its costs and to raise funds to be used in furtherance of its published goals. That the Board would permit one and fail to permit the other on the basis that plaintiffs' activity was ideological and the other was recreational, even though done in good faith, demonstrates the potential for abuse and arbitrary action that exists under the current system.

Even if the term "recreational" could be precisely and narrowly defined, or if narrow guidelines could be developed to draw an objective line between activities which are recreational, and those which are ideological, the extant restrictions would not pass constitutional muster. The restrictions purport to allow purely commercial activity to occur in the parks, while, because of a fear of commercialization of the parks, prohibiting "commercial type" activity of an ideological nature. In addition to the fact that the unequal treatment of recreational commercial and non-recreational "commercial type" activities undermines the defendants' contention that the type of activity engaged in by plaintiffs would interfere with a significant governmental interest, the restrictions ignore the constitutionally preferred position of expressive speech over purely commercial speech.

Defendants do not explain how or why fundraising sales in furtherance of ideological purposes would be more threatening to the governmental interest of a "non-commercial" park than are purely commercial sales for profit. Defendants appear to imply that the activity allowed, purely commercial recreational sales, is in harmony with the recreational purposes of parks and thus less harmful to the atmosphere of the parks. This argument focuses on one aspect of parks without consideration of other purposes served by an urban park. Parks have been "held in trust for the use of the public ... for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. C.I.O.*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). Thus, in the balance against countervailing government interests, whatever weight is accorded to the fact that a purely commercial sale might be recreational is equalled or outweighed by the fact that the "commercial type" sale is ideological. Insofar as the defendants tolerate sales at all, it cannot choose to limit them to purely commercial, albeit recreational, sales to the exclusion of purely ideological solicitations and sales. *See Metromedia, Inc. v. San Diego*, 453 U.S. 490, 513, 101 S.Ct. 2882, 2895, 69 L.Ed.2d 800 (1981) (plurality opinion).

Defendants cite the deed of dedication to Loose Park as an additional justification for the restriction on sales in that park. The Court need not examine the validity of a grant of land as a public park which prohibits the exercise of first amendment rights, nor speculate on the effect of a violation of the terms of the grant. The deed purports to restrict certain uses of the land in that it provides that "No concession and/or privileges for the sale of articles of any kind within the park shall be granted, given or sold except in or in connection with the building or buildings to be erected as aforesaid."

The City need not grant any "concession and/or privilege." Any right to use the park for First and Fourteenth Amendment purposes arises under the United States Constitution and is not dependent on the

concessions of the defendants. The question at issue here is whether defendants' restrictions on a fundamental right are valid. Removal of these restrictions would be in spite of defendants' efforts and only through a most tortured construction could be viewed as their grant of a "concession and/or privilege."

Plaintiffs also challenge certain of defendants' ordinances which prohibit anonymous or commercial handbilling and question whether the City can prohibit fundraising sales of items that are not intimately associated with the selling organization's message (i.e., a bake sale). There is some question whether the record in this case shows an actual controversy over anonymous or commercial handbilling. Plaintiffs were told by park rangers that they would not be allowed to pass out literature at all. Subsequently, defendants agreed that the restrictions on ideological literature were void. There is no evidence that plaintiffs attempted or would be interested in, but are "chilled" from, distributing anonymous or commercial handbills, nor that the defendants are likely to try to enforce the challenged ordinances. The same is true with regard to sales of items not intimately related to plaintiffs' message. There is no indication that plaintiffs were removed from the park for selling anything except T-Shirts and buttons, which themselves conveyed a message. In fact, plaintiffs admit that "This issue arises out of conferences of counsel."

While the Court understands that defendants may want concrete judicial guidance in locating the outer limits of their regulatory power when formulating new ordinances, the Court has no jurisdiction to decide hypothetical issues; there must exist an actual case or controversy. U.S. Const., Art. III, § 2. There "must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1936).

On the record as it now stands these issues do not present a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *See Steffel v. Thompson,* 415 U.S. 452, 460, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974). Furthermore, the issue regarding anonymous handbills was not specifically addressed as remaining in the case in the Standard Pre-trial Order No. 2 which was filed May 5, 1983, following a partial settlement of the issues originally in the case.

Accordingly, it is hereby ORDERED:

(1) That § 67 of the Charter of Kansas City, and § 30.88 of the Ordinances of Kansas City, insofar as they are applied to totally restrict the fundraising activities of political, religious, and other non-commercial activities or groups in the open areas of the public parks of the City of Kansas City, including Loose Park, are void as violative of the Fourteenth Amendment to the United States Constitution;

(2) That defendants shall refrain from enforcing § 67 of the Charter of Kansas City, and § 30.88 of the Ordinances of Kansas City as applied to political, religious and other non-commercial activities or groups in the open areas of the public parks of the City of Kansas City, including Loose Park;

(3) That the defendants shall refrain from prohibiting fundraising by political, religious, or other non-commercial groups, in the form of sales of items intimately related to a message expounded by such group, or in the form of solicitations of donations;

(4) That nothing in this order shall prevent the application of proper exercises of police power such as prohibitions on littering, disturbing the peace, affixing signs in such a way as to harm vegetation or park structures, or other regulations applicable to all users of the parks;

(5) Nothing in this order shall prevent the defendants from developing and putting into practice reasonable time, place,

and manner restrictions which are narrowly tailored to further a substantial governmental interest;

(6) That the parties confer within 15 days of the date of this order and agree on a method of making public the change in policies outlined above; if no agreement is possible the Court is to be informed of the nature of the disagreement within 20 days of the date of this order;

(7) That training, including written instructions, be provided to all park rangers and supervisory personnel with responsibility for managing the parks of the City of Kansas City, which will outline and describe, in conformity with this order, the scope of political, religious and other non-commercial fundraising activities in the parks.