**FRIENDS OF the VIETNAM
VETERANS MEMORIAL,
et al., Plaintiffs,**

v.

**Roger G. KENNEDY, et al., Defendants.**

Civ. A. No. 95–808.

United States District Court,
District of Columbia.

Sept. 12, 1995.

Alexander P. Humphrey, Chevy Chase, MD, David Liberman, Los Angeles, CA, for Friends of the Vietnam Veterans Memorial, Warriors Incorporated, Last Firebase Archives Project, Americans for Freedom Always, Gaudiya Vaishnava Society, One World One Family Now, Inc., Open Art, Inc.

Marina Utgoff Braswell, U.S. Attorney's Office, Washington, DC, for Roger G. Kennedy, Robert G. Stanton, Robert E. Langston.

Valerie J. Menard, Washington, DC, pro se.

David Ingles Stone, Fairfax, VA, pro se.

Arthur Barry Spitzer, American Civil Liberties Union, Washington, DC, for American Civil Liberties Union of the National Capital Area.

Craig A. Johnson, Wiley, Rein & Fielding, Washington, DC, for American Alliance for Rights and Responsibilities.

## MEMORANDUM OPINION

SPORKIN, District Judge.

The issue before this Court is whether a National Parks Service Regulation banning the sale of message bearing T–Shirts on the Mall and other parks in the National Capital area violates the First Amendment of the Constitution. Plaintiffs are a number of non-profit groups, who engage in the sale of message-bearing T–Shirts on the National Mall.

### I. *Background*

Seven groups, Friends of the Vietnam Veterans Memorial (FVVM), Gaudiya Vaishnava Society (GVS), One World One Family Now (One World), Warriors Incorporated, Open Art, Last Firebase, Americans for Freedom Always (AFFA),[1] have challenged the Parks Department Regulation 36 C.F.R. § 7.96(k)(2) as a violation of their rights under the First Amendment to the Constitution.[2] Four of the seven groups attempt to raise public awareness about POW/MIAs from the Vietnam War and use message bearing T-shirts as a way to spread their message. Other plaintiff groups, such as Open Art are protesting environmental damage such as global warming and depletion of the ozone layer.

In pertinent part the regulation in question, 36 C.F.R. § 7.96(k)(2) reads:

> No merchandise may be sold during the conduct of special events or demonstrations except for books, newspapers, leaflets, pamphlets, buttons, and bumper stickers.

The primary focus of the parties has been the effect of the regulation as it applies to the sale of T-shirts on the National Mall. Indeed, in its commentary on the regulation, the National Park Service had this to say:

---

1. The Court also granted motions by the American Alliance for Rights and Responsibilities and the American Civil Liberties Union of the National Capital Area to appear as *amici curiae.*

2. "Congress shall make no law abridging ... the freedom of speech...." *U.S. Const. amend.* I.

After careful consideration, the NPS has concluded that the basic problem of commercialization and attendant adverse impacts on park values is caused by T-shirt sales. It has also concluded that the problem cannot be abated by other than a ban on such sales on park land. (National Capital Regions Parks; Special Regulations, 60 Fed.Reg. at 17642 (1995).)

The Mall runs from the grounds of the Capitol to the Lincoln Memorial and is bordered by a series of major thoroughfares including Pennsylvania Avenue, Madison Drive, and Constitution Avenue to the North and Maryland Avenue, Jefferson Drive, and Independence Avenue on the South. Tourist attractions such as the Smithsonian Institute, and the National Air and Space Museum, and numerous government buildings border the Mall.

Millions of people come to the Mall every year. It is regularly visited by sunbathers, runners, softball and touch football players, strollers and others visiting the monuments or simply coming to enjoy the park. It is the site of festivals and concerts both large and small.

The National Mall also has a venerable history as the site of some of the largest demonstrations in this nation's history concerning important issues. Martin Luther King made his "I Have A Dream" speech before a crowd of over 100,000 on the Mall during the 1963 March on Washington.[3] Numerous demonstrations against the Vietnam War were held there;[4] more recently groups advocating for and against restrictions on abortion have gathered on the Mall.

Although the parties focused on the Mall in their briefs and in argument, the ban on sales applies to other parks in the District of Columbia, including Dupont Circle, the Ellipse and Rock Creek Park.

3. See, e.g., Taylor Branch, Parting the Waters, America During the King Years, 881–83 (1988).

4. For example, the 1967 March on the Pentagon assembled at the reflecting pool. See, e.g., Norman Mailer, The Armies of the Night, 105–23 (1968).

II. Analysis

A.

In determining whether the regulation is constitutional as applied, the Court must first determine whether plaintiffs are engaged in activities protected by the First Amendment. Although the language of the First Amendment refers to "freedom of speech," it is undisputed that the Constitution protects more than oral expression. The Supreme Court has found burning the American flag, Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), words written on clothing, Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971),[5] and black armbands worn to protest the Vietnam War, Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 505–06, 89 S.Ct. 733, 735–36, 21 L.Ed.2d 731 (1969), to be protected by the First Amendment. The plaintiffs in this case are selling materials that convey distinct messages, such as T–Shirts that attempt to raise public concern about the plight of MIAs and POWs in Vietnam.

B.

In Iskcon v. Kennedy, 61 F.3d 949 (D.C.Cir.1995), the Court of Appeals considered a challenge by the International Society of Krishna Consciousness to the validity of the Parks Service regulation as applied to solicitation and the sale of religious beads on the Mall. Judge Buckley's majority opinion and Judge Ginsberg's dissent in Iskcon set forth much of the applicable First Amendment law.

The Mall and other parks in the Nation's Capital are public forums. See United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983) ("Public places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.'").

5. Overturning conviction on First Amendment grounds of man wearing jacket bearing the words " * * * * the Draft."

In determining how far the government may go in imposing restrictions on expression in a public forum, the *Iskcon* panel analyzed the regulation under the test set forth in *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989). Under that test, restrictions are valid if they are 1) content neutral, 2) narrowly tailored to serve a significant governmental interest, and 3) leave open ample alternative channels for communication of the information. *See Id.* at 791, 109 S.Ct. at 2753.[6]

The *Iskcon* court found the regulation at issue here was content neutral.[7] But the panel unanimously found that the regulation banning solicitation was not narrowly tailored. *See Iskcon,* at 956 (Government interest in preventing "ills associated with runaway solicitation" does not justify sweeping ban on in-person solicitation throughout the Mall.) The majority of the panel upheld the ban on sales as applied to beads and audiotapes, because it was narrowly tailored and left open ample alternative means of communication.[8] The opinion was silent with respect to message-bearing T-shirts.

### III. *The Cited Governmental Interests*

"In a First Amendment challenge, the government bears the burden of showing that its restriction of speech is justified under the traditionally narrowly tailored test." *United States v. Doe,* 968 F.2d 86, 90 (D.C.Cir.1992). In attempting to justify the new sales regulation the government has proffered five interests that it claims are significant.

The government places the most emphasis on its first purported interest—eliminating "discordant and excessive commercialism [on] federal land" and the resulting "degraded aesthetic values." Administrative Record (hereinafter "AR") at L. The government also claims that the sales regulation is narrowly tailored to serve the significant inter-

---

**6.** The plaintiffs argue that even though the regulation is content neutral, this Court must subject it to strict scrutiny because it *bans* an entire medium of communication rather than imposing an ordinary time, place or manner restriction. *See United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983) (differentiating between typical time, place and manner restrictions and regulations that completely banned a particular form of expression); *see also Chesapeake & Potomac Telephone Co. of Va. v. United States,* 42 F.3d 181, 203 (4th Cir.1994).

However, in its most recent opinion concerning a total ban (or near complete ban) on residential signs, the Supreme Court appeared to use the traditional time, place and manner test in deciding whether to invalidate a municipal ordinance. *See City of Ladue v. Gilleo,* — U.S. —, —, 114 S.Ct. 2038, 2046, 129 L.Ed.2d 36 (1994). There is tension between the balancing test employed in *Ladue* and the Court's use of strict scrutiny in *Grace.* Underlying First Amendment principles suggest that the approach taken in *Ladue* is appropriate here. Courts apply strict scrutiny to government restrictions on speech based on its content. "For if the constitutional guarantee means anything, it means that, ordinarily at least, 'government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" Laurence Tribe, American Constitutional Law, § 12–2 at 790 (2d ed.) (citing *Police Dept. of the City of Chicago v. Mosley,* 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2289–91, 33 L.Ed.2d 212 (1972)). The purpose of applying strict scrutiny is to prevent any government effort to "prescribe what shall be orthodox in politics, nationalism, reli-

gion, or other matters of opinion." *West Virginia v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943). Where, as here, the government makes no effort to target certain messages and not others, but aims instead at the harmful effects of the activity, strict scrutiny is not called for. *See* American Constitutional Law, § 12–2, at 791.

The Court must nevertheless be particularly wary of content-neutral restrictions that ban a particular medium, or a number of media of expression, because a total ban creates a greater risk of sweeping more broadly than most content neutral restrictions, and failing to leave open ample alternative means of communication. *See City of Ladue v. Gilleo,* — U.S. —, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994); *Gerritsen v. City of Los Angeles,* 994 F.2d 570, 577 (9th Cir.1993) ("[C]ourts have rarely upheld complete bans on a category of First Amendment expression.") In this case, because the Court finds the regulation invalid, as applied, under the traditional time, place and manner test, the decision not to apply strict scrutiny is not crucial to the holding.

**7.** A regulation is content-neutral if it is "justified without reference to the content of the regulated speech." *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) All parties, and amici agree that the regulation is content neutral because the sale of T–Shirts, and other items, is banned regardless of the content of the message they bear.

**8.** Judge Ginsberg dissented.

est of relieving "increasing pedestrian and vehicle congestion," AR at E, preventing damage to the Mall's trees, shrubs, grass and soil, *id.* preserving unimpaired views of the monuments, and finally preventing "criminally related offenses." *Id.*

■ The primary interest that the government relies on to justify its regulation is preventing "discordant commercialism" and eliminating a "flea market" atmosphere in National Parks. AR at C.[9] The government has developed the record on this issue more than on any other. It has submitted numerous written statements about the effect of vendors on the Mall and photographs of various portions of the Mall. Despite the Park Service's action, the Court finds the absolute ban on the sale of T–Shirts invalid on two grounds. First, the sales ban does not leave open ample alternative means of communication; second, it is not narrowly tailored to achieve the government's interest.

IV. *Ample Alternative Means of Communication*

In *Iskcon,* the divided panel found that a sales ban on beads did leave open ample alternative means of communication. Beads and T–Shirts are a significantly different form of communication, however. A complete ban on the sale of message-bearing T–Shirts, does not leave open ample alternative means of communication for two reasons. First, the message-bearing T-shirt is a unique and especially effective means of communicating the plaintiffs' point of view. Second, sale of the T-shirts is the primary source of funds that enable these groups to continue to engage in their First Amendment activities.

The T–Shirt has become a unique means of spreading messages over the last twenty years. Unlike a book or pamphlet, the T–Shirt not only carries a message, it also turns the wearer into a "human billboard". *See* Affidavit of Larry Bice at ¶ 6 ("The sale of T-shirts containing a POW/MIA message is also our most effective form of communication. By obtaining and wearing one of our shirts, visitors carry our message all over the United States and the world. Indeed, no other mode of communication within our financial capacity has had the positive impact of message-bearing T-shirts."); *see also* affidavit of Gregory Scharf at ¶ 4; affidavit of Walt Sides at ¶ 4; affidavit of Hans G. Bickel at ¶ 2. As such, it is an effective and inexpensive way to spread the seller's message broadly.

■ While the message-bearing T-shirt may be a relatively new form of communication it has become a popular and indispensable means of communication for non-profit groups like plaintiffs. *See generally* affidavits attached to plaintiffs' application for temporary restraining order. In some ways message bearing T-shirts serve the same purpose as the pamphlet did when this country was merely a British colony. Courts must be continually on guard to ensure that the First Amendment protections are relevant to the reality of modern expression. It is for this reason that the Supreme Court has found that the First Amendment protects forms of expression like movies, *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. at 501, 72 S.Ct. at 780, and cable television broadcasting, *Turner Broadcasting System, Inc. v. FCC,* —— U.S. ——, —— – ——, 114 S.Ct. 2445, 2456–57, 129 L.Ed.2d 497 (1994), that the Founding Fathers might never have envisioned. Similarly, this Court must take into account the unique role that message-bearing T–Shirts, a relatively new form of expression, plays in allowing small non-profit groups, like the veterans organizations at the Vietnam memorial, to spread their message. *See Ladue,* —— U.S. at —— – ——, 114 S.Ct. at 2046–47 (recognizing the special and distinct nature of residential signs as opposed to bumper stickers or sandwich boards); *see also Metromedia,* 453 U.S. at 527, 101 S.Ct. at 2902 (Brennan, J. concurring in judgment) (recognizing the importance of considering the different natures and values of various media of expression.)

---

9. Former National Park Service Director James Rittenour has supported the regulation as a means to eliminate "the carnival atmosphere that erodes the dignity of our national capital parks and memorial." AR at E.

What is more, message-bearing T–Shirts have become an integral part of large-scale single day demonstrations or marches. During these events, many marchers wear T–Shirts that carry messages that further the expressive function of the march. The message-bearing T–Shirt enables the protester or marcher to express his or her point of view visually and demonstrate solidarity with his or her fellow marchers. The message-bearing T–Shirt serves as the voice for those who, because of age or infirmity, cannot speak, chant or sing. The availability of large numbers of T–Shirts all carrying a visually and ideologically identical message creates a coherence within the march and thereby increases the power of its message. Simply put, message-bearing T-shirts have become an essential part of almost all marches and protests. Books, pamphlets and bumper stickers cannot serve the same function and clearly cannot be considered adequate alternative means of expression. At this point in history, a march without message-bearing T–Shirts would be like a sporting event without pennants or banners.

The government has conceded that the ban on the sale of message-bearing T–Shirts does not extend to giving them away. It is the government's position that the commercial aspect of the activity deprives it of First Amendment protection. The government's position is neither factually nor legally sustainable. Allowing groups to give away T–Shirts is not an ample alternative means of communication. Few non-profit groups can afford to give away large numbers of message-bearing T–Shirts, which cost money to design, print and produce. The sale of T–Shirts is also the primary means by which many of the plaintiff groups are able to raise money in order to continue to engage in spreading their message. *See* affidavit of Ira Hamburg at ¶ 4 ("The sale of message-bearing T–Shirts is vital to [Friend's of the Vietnam Memorial's] mission. [E]xpressive T–Shirts are our principal method of raising funds to support our activities. . . ."); *see also* affidavit of Swami B.V. Tripurari at ¶ 4; affidavit of Walt Sides at ¶ 4; affidavit of John Holland at ¶ 6. Forbidding the sale of message-bearing T-shirts would substantially

impair the ability of the plaintiff groups to spread their messages.

Preventing the non-profit plaintiffs in this case from selling T–Shirts would place a significant burden on their efforts to disseminate T–Shirts bearing their groups' message. People who buy the shirts and wear them help the groups' spread their message. *See, e.g.,* Affidavit of Gregory Scharf at ¶ 4. Denying plaintiffs the ability to cover the costs of their T-shirts would significantly burden their ability to communicate their message.

The Supreme Court recently recognized that prohibiting "speakers" from receiving compensation for their speech can severely burden a speaker's ability to speak. In *United States v. National Treasury Employees Union,* the Court struck down a federal law, § 501(b) of Ethics in Government Act, that prohibited federal employees from receiving compensation for speeches or articles. —— U.S. ——, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). That statute, like the regulation here, did not ban any expressive activity, it merely forbade the speaker or writer's receiving money for the activity. The Court found that

> [a]lthough § 501(b) neither prohibits any speech nor discriminates among speakers based on the content or viewpoint of their messages, its prohibition on compensation unquestionably imposes a significant burden on expressive activity. *See Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Board,* 502 US 105, 112 S.Ct. 501 [116 L.Ed.2d 476] (1991). *Minneapolis Star & Tribune, Co. v. Minnesota Commissioner of Revenue,* 460 US 575 [103 S.Ct. 1365, 75 L.Ed.2d 295], (1983); *see also Arkansas Writers Project, Inc. v. Ragland,* 481 U.S. 221, 227 [107 S.Ct. 1722, 1726, 95 L.Ed.2d 209] (1987). Publishers compensate authors because compensation provides a significant incentive toward more expression. By denying respondents that incentive, the honoraria ban induces them to curtail their expression if they wish to continue working for the Government.

*Id.,* —— U.S. at ——, 115 S.Ct. at 1014. A total ban on plaintiffs' selling message-bearing T-shirts is such a burden on their ability

to spread their message that it violates their First Amendment right to freedom of speech.

## V. *Narrow Tailoring*

The government has an undeniable interest in preventing excessive commercialism and a flea market atmosphere on the Mall. *See Iskcon,* 61 F.3d 949. The Court can only determine whether the means chosen to achieve the government's interest is narrowly tailored by considering the particular site involved. *See United States v. Doe,* 968 F.2d at 90. Under this analysis, the sales ban is narrowly tailored in many areas of the Mall such as near the monuments where the preservation of a non-commercial atmosphere around the national monuments is a significant interest. But in other areas of the Mall and in other areas of the National Capital Parks, the ban is broader than necessary to achieve the government's interests. In addition, the regulation is not narrowly tailored because it fails to take into account the dramatic differences between the areas surrounding the monuments on the one hand and parks such as Dupont Circle on the other hand. *See Washington Free Community, Inc. v. Wilson,* 334 F.Supp. 77, 82 (D.D.C. 1971) (Corcoran, J.).

It is undisputed that there are permanent commercial stands on the Mall, where film, food, drinks and souvenirs are sold. AR at K. During the summer months, the Parks Service also allows fourteen mobile food vendors to roam the Mall selling ice cream and other food items. *Id.* The existence of licensed commercial activity like ice cream vendors on the Mall, which is not protected by the First Amendment, undercuts the government's claim that banning a significant amount of First Amendment activity throughout the *entire* Mall, and all the National Capital Parks, is narrowly tailored. *See United States v. Doe,* 968 F.2d at 90; *see also Metromedia, Inc. v. City of San Diego,* 453 U.S. at 531–32, 101 S.Ct. at 2904–06 (Brennan, J., concurring in judgment). The

Parks department cannot claim that the sales ban is narrowly tailored to promote the government's interest in avoiding "discordant commercialism" in areas that are far away from monuments and next to stands where vendors peddle hot dogs and film.[10] *See Van Allsburg v. City of Kansas City,* 600 F.Supp. 1226, 1233 (W.D.Mo.1984) ("If having a vendor sell recreation-related articles purely for personal profit is allowed under the present policies as not unduly commercializing the parks, the Court is convinced that the nature, function, order, and beauty of the parks can be preserved by restrictions significantly less onerous than a total ban on fundraising."); *see also United States v. Doe,* 968 F.2d at 90–91.

The government argues that it would be too difficult and complicated to determine how to regulate the numbers of vendors or how to restrict vendors to certain areas of the Mall. It claims that it has no choice but to enact a total ban. This argument is not sustainable. The government concedes that it is able to regulate commercial activity on the Mall that is not protected by the First Amendment. AR at K. There are numerous "content-neutral" ways to restrict the number and/or placement of vendors. Administrative convenience is not a justification for significant restrictions on First Amendment activity. The government's successful management of other commercial vendors belies its claim that it cannot regulate non profit groups selling T–Shirts.

This Court's role is only to rule on the Constitutionality of the regulations, not to attempt to redraft them. *See White House Vigil v. Clark,* 746 F.2d 1518 (D.C.Cir. 1984). This Court recognizes that the Constitution does not give people the right to set up commercial establishments on anyone else's land, including the government's. Plaintiffs' First Amendment rights do *not* extend to taking significant parts of the Mall out of public use by indiscriminately setting up "shops" from which to sell their wares.

---

**10.** While the *Iskcon* panel considered the government's interest in avoiding excessive commercialism it did not specifically address whether the application of the sales ban was narrowly tailored in areas in which the government licenses concessionaires who are indisputably both com-

mercial in nature and engaging in activities not within the ambit of the First Amendment. Nor did the *Iskcon* panel consider the application of the sales regulations to Parks such as Dupont Circle, which is in the center of one of the prime commercial areas in the District.

The government has available to it a number of possible narrowly tailored means to fulfill the public interest within the constraints of the First Amendment. The Parks Service does regulate the placement and numbers of commercial vendors on the Mall, and it could so regulate the placement and/or number of T–Shirt vendors in a way that is narrowly tailored and leaves open ample alternative means for groups to enjoy the guarantees of the First Amendment. In regulating this activity, the government must appropriately balance the First Amendment interests of groups like the plaintiffs with the public interest in preventing discordant commercialism so that all can enjoy these magnificent park lands.

The Court is not unaware that T–Shirts have been criticized as "cheap, cheesy and commercial". But the message bearing T–Shirt is also a tribute to the creative spirit of poorly funded but inventive activists of every political persuasion who have discovered the expressive power and appeal of making an item of clothing serve also as a means of communication. We must not forget that the First Amendment protects the ability of speakers to get their message across even when the majority might find the message or the means by which it is spread objectionable. Cf. *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971).

## VI. *The Government's Other Asserted Justifications for the Ban*

■■■ The government claims that its interest in crime prevention—eliminating the temptation to rob vendors and preventing the occasional fights among vendors competing for prime locations—justifies the sales ban. The First Amendment requires that the government protect those engaged in First Amendment activity rather than banning the activity as a means to protect the "speaker." *See, e.g., Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 751 F.Supp. 218 (D.D.C.1990), *aff'd*, 972 F.2d 365 (D.C.Cir. 1992) (government's duty is to protect persons exercising First Amendment rights, not

to forbid them from demonstrating as a means to protect them). Even if there have been a few instances of vendors engaging in spirited disputes among themselves, that would not justify the sales regulation any more than instances of anti-competitive behavior in the newspaper business would justify a ban on the sale of newspapers. *See Turner Broadcasting System, Inc. v. FCC,* —— U.S. at ——, 114 S.Ct. at 2479 ("If the government wants to avoid littering, it may ban littering, but it may not ban all leafletting.... 'Broad prophylactic rules in the area of free expression are suspect.' ") (O'Connor, J., concurring in part, dissenting in part) Here, the government must enforce its laws against robbery and assault rather than banning activities within the scope of the First Amendment.

■■■ The government has a significant interest in protecting unimpeded views of the monuments on the Mall. *See White House Vigil v. Clark*, 746 F.2d 1518, 1522 (D.C.Cir. 1984) This interest must be discharged without unduly affecting the First Amendment rights of citizens. Government imposed restrictions on speech may "eliminate[ ] no more than the exact source of the evil it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988). By banning the sales of T–Shirts outright throughout the entire Mall, the government has employed a cleaver where a scalpel would suffice. There are many parts of the Mall where the presence of vendors would not interfere with the sight lines to the monuments and a visitor's ability to photograph our magnificent monuments without vendors in the photo. Because the regulation eliminates far more than the activity that impairs the view of the monuments, the government cannot justify the regulation on these grounds. *See Iskcon*, 61 F.3d at 956 (Government interest in preventing "ills associated with runaway solicitation" does not justify sweeping ban on in-person solicitation throughout the Mall.)[11]

■■■ The Government contends that its regulation is necessary to reduce "increasing

---

11. In addition, although there are no monuments in Rock Creek Park or Dupont Circle, the sales

ban applies there. *See Washington Free Community*, 334 F.Supp. at 82.

pedestrian congestion." The government has not provided an adequate record to demonstrate the precise nature of the congestion, or, if such a problem exists, that the sale of T-shirts *is* a significant cause of the congestion sufficient to warrant the outright ban of such activity. The burden is on the government to demonstrate the significance of its interest, and that its regulations are narrowly tailored to serve that interest. *See, e.g., United States v. Doe,* 968 F.2d at 88. In this case, the government has failed to meet its burden; it has simply "posit[ed] the existence of [a] disease sought to be cured." *Quincy Cable TV, Inc. v. FCC,* 768 F.2d 1434, 1455 (D.C.Cir.1985). But the government must do more than that. At a minimum, the record must pinpoint the site(s) of the pedestrian congestion, how substantial it is, how it compares to the congestion caused by other activities, such as the myriad of softball games that crowd the Mall in the summer, and what alternatives outside of an outright ban on sales were considered to address the problem.[12]

 This Court must grant significant deference to the judgment of the Parks Service on the best way to discharge its important obligations. *See White House Vigil v. Clark,* 746 F.2d at 1529. The government must develop an adequate record to justify its action. In the First Amendment context deference does not mean that the Court abdicates its role to form "an independent judgment of the facts." *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2471.[13] Even Congress, which is entitled to the highest degree of deference, *see id.,* must justify First Amendment restrictions under intermediate scrutiny. *Id.,* 114 S.Ct. at 2471–72

(Congress must draw reasonable inferences "based on substantial evidence.") Where, as here, the government simply states there is a problem with pedestrian traffic, and puts little more in the record to support its claim, it has not met its burden of justifying the regulation. *See id.*

 It is undisputed that the government has a significant interest in managing the National Capital parklands to prevent the destruction or deterioration of trees, shrubs and grass. *See Clark,* 468 U.S. at 296, 104 S.Ct. at 3070 (The government has a "substantial interest in maintaining the parks in the heart of our Capital in an attractive and intact condition.") Although the government explained that damage to the grounds has occurred, AR at E, it has not set forth the extent of the damage. Nor has it distinguished between the damage to the Parkland caused by use of certain areas as softball diamonds,[14] with that caused by vendors selling T-shirts.[15]

## VII. *Conclusion*

While the First Amendment does not prohibit the government from regulating the sale of message-bearing T-shirts on National Parklands, an outright ban on such sales does violate the First Amendment.

For the reasons set forth above, summary judgment will be granted for the plaintiffs.

12. The government did set forth in the record some of the alternatives that it considered.

13. Judicial oversight of an administrative agency regulation that restricts activities protected by the First Amendment is "not a *Chevron [U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984)] situation where administrative discretion is at its zenith." *United States v. Doe,* 968 F.2d at 90.

14. Numerous large, hardened, grassless patches appear throughout the Mall caused by regular use as softball diamonds.

15. A content-neutral time, place or manner restriction need not be the least restrictive alternative. *See Ward,* 491 U.S. at 797–98, 109 S.Ct. at 2757–58. "But if there are numerous and obvious less-burdensome alternatives to the restriction on speech, that is certainly a relevant consideration in determining whether the 'fit' between the ends and means is reasonable." *City of Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, —— n. 13, 113 S.Ct. 1505, 1510 n. 13, 123 L.Ed.2d 99 (1993).