**Wendy Allen AYRES, individually and on behalf of a class, Plaintiff,**

v.

**CITY OF CHICAGO, a Municipal Corporation, Officer D. Barthell and Officer John Doe (J.M.), Defendants.**

No. 97 C 2176.

United States District Court, N.D. Illinois, Eastern Division.

June 4, 1997.

Edward T. Stein, Mary Lou Boelcke, Lauren Tamburo, Chicago, IL, for Wendy Allen Ayres.

Norma I. Reyes, Anita K. Modak–Truran, Erik J. Lillya, Joshua Davidson, Celia Meza Utreras, Angela Overgaard Luning, Chicago, IL, for City of Chicago.

## MEMORANDUM OPINION AND ORDER

MORTON DENLOW, United States Magistrate Judge.

This case presents the challenging question of whether the City of Chicago's Peddlers' Ordinance violates the First Amendment to the United States Constitution by barring Plaintiff from selling T-shirts which advocate the legalization of marijuana at City-sponsored festivals in Grant Park.

This case comes before the Court on plaintiff's motion for a preliminary injunction. The Court conducted a three-day trial on May 21–23 involving six witnesses and numerous exhibits. Closing arguments were held on May 28. The following constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings may be deemed conclusions of law they shall also be considered conclusions. Similarly, to the extent matters contained · in the conclusions of law may be deemed findings of fact, they shall also be considered findings. See, *Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985).

## I.  THE PARTIES.

1.  Plaintiff Wendy Allen Ayres (hereinafter "Plaintiff") is the founder and a member of the Marijuana Political Action Committee (hereinafter "MPAC"), a not-for-profit unincorporated association of persons who "seek to repeal laws which penalize or prohibit the peaceful, personal, religious, scientific, medical, agricultural, and/or industrial use of cannabis, marijuana and/or hemp." (Px 14). Plaintiff and MPAC "favor laws which permit and/or facilitate such uses." *Id.* Plaintiff has been actively engaged in efforts to legalize marijuana for over fifteen years. In pursuit of these efforts, she created MPAC, which promotes its message primarily through the sale of T-shirts, lobbies legislators and organizes seminars and festivals promoting the legalization of marijuana.

2.  Defendant City of Chicago ("City") is a municipality incorporated under the laws of the State of Illinois.

## II.  JURISDICTION AND VENUE.

3.  Plaintiff brings this civil rights class action pursuant to 42 U.S.C. §§ 1983 and 1988, for violation of her rights under the First and Fourth Amendments to the United States Constitution as applicable to the states and municipalities by the Fourteenth

Amendment. Plaintiff's motion for preliminary injunction relates only to Counts I and II of her Second Amended Complaint. The City's Answer to Counts I and II of the First Amended Complaint stands as their answer to Counts I and II of the Second Amended Complaint. The motion for preliminary injunction was tried before a magistrate judge by consent pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73.

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

### FINDINGS OF FACT

### III. BACKGROUND FACTS.

#### A. The City of Chicago's Peddlers' Ordinance.

6. The City of Chicago's Peddlers' Ordinance is encompassed in Chapter 4–244 of the Chicago Municipal Code. (Dx 1b). The Peddlers' Ordinance states that "It shall be unlawful for any person to engage in the business of a peddler without a license so to do; ..." Code § 4–244–030. The Code defines a peddler as "any individual who, going from place to place, shall sell, offer for sale, sell and deliver, barter or exchange any goods, wares, merchandise, wood, fruits, vegetables or produce from a vehicle or otherwise. The word 'peddler' does not include a grower or producer ..." Code § 4–244–010.

7. Chicago first enacted a Peddlers' Ordinance in 1939. (Dx 1c). Since that time, the City has restricted peddling in certain designated areas. The current Ordinance provides in pertinent part:

> No one having a peddler's license shall peddle any merchandise or any other article or thing whatsoever, at any time, within districts which have been or shall be hereafter designated by the city council. A description of such districts shall be kept in the office of the city clerk.

*Id.* at § 4–244–140. The penalty for violating the Ordinance is a fine of "not less than $200.00 nor more than $500.00 for each offense, and each day such violation shall continue shall be deemed a distinct and separate offense." *Id.* at § 4–244–140.

8. The Peddlers' Ordinance applies to all "goods, wares, merchandise, wood, fruits, vegetables or produce." *Id.* at § 4–244–010. It does not distinguish between peddling purely commercial merchandise and peddling merchandise containing political or religious ideas. Other than the sale of newspapers, which is allowed under a separate ordinance, Code § 10–8–520 (1996), all peddling is prohibited in the designated district.

**Central District.**

9. On April 13, 1994, the City Council designated the central district of Chicago as a restricted area for peddling. Chicago City Council, *Journal of Council Proceedings,* April 13, 1994, at 48878–79. (Dx 1a). In general terms, the central district of Chicago encompasses the area from the Chicago River on the North, McCormick Place on the South, Lake Michigan on the East and Ashland Boulevard on the West. The central district includes, *inter alia,* the Loop, McCormick Place, the Shedd Aquarium, the Field Museum, the Art institute, the renovated State Street, Greektown, Chinatown, major hotels and the near north restaurant and business district. (Dx 25 contains a map depicting the areas in which peddling is prohibited). The central district also includes Grant Park, where the City sponsors the Chicago Blues Festival, Taste of Chicago and other festivals which attract millions of Chicago residents and tourists.

10. The Peddlers' Ordinance applies to all City-owned property and to property the City temporarily leases, such as Grant Park, for City-sponsored events.

**Peddling License Procedures.**

11. Peddlers are required to obtain a peddling license. Code, § 4–244–030.

12. A person who desires a peddler's license must complete an application, submit the completed application to the City's Department of Revenue and pay a fee. (See, Dept. of Revenue Peddling Package, Dx 2). The application requires a State of Illinois sales tax number, legal identification and a notarized indebtedness affidavit to the City of Chicago.

13. Upon receiving a completed application and payment of the filing fee, the Department of Revenue issues a one-year peddling license, which applies from February 16 to February 15 of the following year. The City does not review the content of the applicant's goods or merchandise. Nor does the City limit the number of peddler licenses it issues. (Dx 2).

14. Plaintiff has never applied for a peddler's license and does not hold a peddler's license issued by the City of Chicago. Plaintiff does not hold a permit from the Chicago Park District to sell goods and merchandise in the parks.

15. Even if Plaintiff held a peddler's license, the City would not permit her to sell MPAC T-shirts at City-sponsored festivals because Grant Park is in a designated district.

**General Orders and Law Department Memorandum.**

16. On July 3, 1992, the Chicago Police Department issued an addendum to General Order [1] 92–1 that it would not take any enforcement action which would prohibit or impede an individual from selling or distributing printed matter on or about the public ways. (Dx 7). ¶ III(B) provides in part:

1. Any person on the public way or in any public place has a right to:
   a. express his views through any form of communication, including distribution or sale of newspapers, magazines, handbills or other printed matter; and
   b. solicit financial contributions for political or religious causes.
2. Persons expressing political or religious views on a public way or in any public place are required to comply with all laws and ordinances prohibiting physical obstruction of the movement of persons and vehicles on the public way or place, damage to public or private property, and any and all other applicable laws or ordinances.
3. The sections of the Municipal Code of Chicago ... delineated below [which includes the Peddlers' Ordinance] *do not apply to persons* who distribute or sell

material containing *political or religious ideas* on a public way or other public place. (Emphasis in original).

17. The Mayor's Office of Special Events organizes the City-sponsored festivals in Grant Park. In 1996, the City's Corporation Counsel was requested to clarify the applicability of the Peddlers' Ordinance to the City-sponsored festivals in Grant Park. On June 7, 1996, the Law Department advised the Chicago Police Department that to the extent that "General Order 92–1 and Addendum exempts peddlers from arrest, it is incorrect and must be revised, as it is creating confusion among the police department, the Mayor's Office of Special Events and the general public." (Dx 6). The memorandum stated in part:

It is the legal opinion of the Law Department that individuals selling merchandise in the areas prohibited by ordinance are peddling in violation of the ordinance and may be arrested without regard to the police general order and without regard to the message that may be contained on the merchandise that they are distributing or selling. Individuals may not circumvent the peddling ordinance by claiming that their illegal actions are protected by the first amendment. Nor may they use police general orders to acquire rights they do not have.

This opinion was sought in response to claims by Plaintiff and others that their activities in selling MPAC T-shirts were protected by the First Amendment and General Order 92–1, as amended.

18. Subsequently, on June 14, 1996, the Chicago Police Department revised General Order 92–1 and issued Addendum 2, which rescinded its application to peddlers. (Dx 7). As a result, Chicago police officers, after first giving a warning, began ticketing Plaintiff and others who sought to sell T-shirts at City-sponsored festivals. (Px 1).

**B. Plaintiff's Activities.**

19. Plaintiff promotes the activities of MPAC primarily through the sale of T-shirts.

---

1. A general order is a regulation for the administration of the Chicago Police Department.

T-shirts represent the principal means by which Plaintiff finances and communicates MPAC's message seeking to legalize marijuana. She has been selling T-shirts at City-sponsored festivals since at least 1986. Plaintiff arranges for the production of the MPAC T-shirts at a cost of approximately four dollars apiece. She sells the T-shirts at a cost of five dollars apiece to crew chiefs. The crew chiefs recruit others to resell the T-shirts. The crew chiefs sell the shirt for seven to eight dollars and the T-shirts are then sold at festivals or other locations for ten dollars. The front of the T-shirts bear the logo "End Prohibition Now" over a large marijuana leaf and quote the marijuana initiative and numerous messages supporting the organization's program. (Px 14 and Dx 39). On the back of the T-shirts are a calendar of events and MPAC membership certificate. According to Plaintiff, one becomes a member of MPAC by wearing the T-shirt or by promoting MPAC's political agenda to decriminalize the possession and use of marijuana.

20. Whether and to what degree marijuana should be legalized is a current topic of debate in our society. See, e.g. Matthew W. Grey, *Medical Use of Marijuana: Legal and Ethical Conflicts In the Patient/Physician Relationship*, 30 University of Richmond L.Rev. 249 (1996); Erik Grant Luna, *Our Vietnam: The Prohibition Apocalypse*, 46 DePaul L.Rev. 483 (1997); and Lisa M. Bianculli, *The War on Drugs: Fact, Fiction and Controversy*, 21 Seton Hall Legis.J. 169 (1997).

## C. Plaintiff is Ticketed in 1996.

21. While selling the T-shirts at Taste of Chicago during 1996, Plaintiff was approached by a City police officer and warned she could not continue what she was doing.

22. Plaintiff showed the officer a copy of Chicago Police Department Message No. 92–008351, dated September 4, 1992, from John J. Klein, General Counsel, to the Superintendent ("Klein memo") which states:

> Pending review by the Department of Law, and until further notice, all members will refrain from taking any enforcement actions which would prohibit or impede an individual from selling or distributing printed matter on or about the public ways, including the proximity of Sports Stadiums. (Px 6).

23. Klein's memo reaffirmed what had been the City's long-standing policy, practice and custom to exempt certain activities from the provisions of the City's peddling ordinances. (See, e.g. Chicago Police Department Special Order 79–24 dated July 24, 1979, Px. 7, Special Order 95–18 dated August 28, 1985, Px. 8, General Order 92–1 and addendums, Dx 7).

24. Plaintiff was in possession of a copy of Klein's memo. Each year Plaintiff would go to the Chicago Police Department's Legal Affairs Division and the Police Command Post and ask the officers to read and verify that the Order was still in effect. The officer would often sign Plaintiff's copy of Klein's memo. (Px 6). She would give copies to persons who were selling MPAC T-shirts. Then, when an officer approached, they would show the officers the memo in order to prevent an arrest.

25. On June 28, 1996, at Taste of Chicago, an officer stopped Plaintiff from selling MPAC T-shirts and asked her to go to the Command Post with him. She complied. The Commander provided Plaintiff with a copy of the Corporation Counsel's June 7, 1996 opinion authorizing the arrest of persons selling merchandise "without regard to the message that may be contained." (Dx 6).

26. Plaintiff then went to another area of the park, the sidewalk on Jackson Blvd., east of Michigan Ave., and sold a T-shirt. She did not believe she was still in the Taste of Chicago festival area. Immediately, two Chicago police officers arrested her, took her to their police car, confiscated approximately thirty (30) T-shirts, and charged her with two ordinance violations: peddling without a license (4–244–030) and peddling in a restricted area (4–244–140). (Px 1).

27. MCC chapter 4, § 244–140, Prohibited Districts, bans all sales by peddlers in the central district of Chicago. At its longest

and widest, this is an area roughly four by three-and-a-half miles.[2]

28. Plaintiff appeared in court on November 4, 1996, and was found guilty of peddling without a license and placed on supervision until April 1, 1997.

29. Plaintiff was ticketed numerous times prior to June 28, 1996, for distributing her T-shirts at City sponsored festivals. All of Plaintiff's previous peddling charges were dismissed.

30. For 1997, the Mayor's Office of Special Events, which is a department of the City of Chicago, will sponsor the following events in Grant Park free to the public:

- 14th Annual Chicago Blues Festival on June 5 through June 8;
- 13th Annual Chicago Gospel Festival on June 14 through June 15;
- 17th Annual Taste of Chicago on June 27 through July 6;
- 7th Annual Chicago Country Music Festival on June 27 through June 28 (which is part of Taste of Chicago);
- 19th Annual Chicago Jazz Festival on August 28 through August 31; and
- 9th Annual "VIVA! Chicago" Latin Music Festival ("Chicago Viva Festival") on September 13 through September 14, 1997.

(Dx 8).

31. At these festivals, the City provides for the sale of food, beverages and souvenirs in conjunction with entertainment. (Dx 42).

32. James E. Sheahan, Executive Director of the Mayor's Office of Special Events, testified at the trial. He explained that his office spends nearly the entire year planning City-sponsored festivals held in Grant Park and contracts with food and souvenir vendors, entertainers and corporate sponsors. (Dx 2 1a and b). The week after Taste of Chicago is completed, planning begins for the next annual Taste of Chicago. At any given point in time, at least fifty people from the Mayor's Office of Special Events assist in the preparation of City-sponsored festivals.

33. Vendors and sponsors pay the City to use booths and tents at the events. (Dx9a-c; 12a-b; 21a-b; 33, 34, 42).

34. The vendors and sponsors at the City-sponsored events sell food and merchandise from stationary locations.

35. Each day of each festival draws tens of thousands (and for some festivals, hundreds of thousands) of people. Attendance figures for the City-sponsored festivals in Grant Park are as follows:

| Festival | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|
| Blues (4 days) | 350,000 | 600,000 | 600,000 | 600,000 |
| Gospel (2 days) | 180,000 | 200,000 | 210,000 | no estimate (200,000) |
| Taste of Chicago (10 days) | 2,750,000 | 2,780,000 | 3,100,000 | 3,250,000 |
| Country (2 days) | 125,000 | 250,000 | 500,000 | 525,000 |
| Jazz (4 days) | 200,000 | 250,000 | 300,000 | 310,000 |
| Viva (2 days) | 120,000 | 75,000 | 150,000 | 150,000 |

(Dx 11a-d).

**Taste of Chicago**

36. Mr. Sheahan described the City-sponsored festivals held in Grant Park. Taste of Chicago is the largest free-admission food and music festival in the United States. This festival appeals to a broad spectrum of people and is the number two tourist attraction in Illinois. The primary focus of Taste of Chicago is the food, with sixty-five of the City's finest restaurants serving up their fare. Taste of Chicago also provides free entertainment with three stages of music.

---

**2.** For the purposes of this preliminary injunction hearing, the only portion of the central district in question is those portions of Grant Park leased or used by the City for its festivals including all streets and sidewalks.

37. The City solicits corporate sponsors to help defray the cost of the festivals and to provide the sponsors with certain exclusive promotional and other benefits. (See, e.g. Dx 21a). Sponsorship levels for Taste of Chicago in 1997 are:

| | |
|---|---|
| Presenting | $300,000 |
| Official Beer | $ 90,000 |
| Official Soda | $ 75,000 |
| Taste Stage | $ 70,000 |
| Kids' Stage | $ 70,000 |
| Ticket | $ 55,000 |
| Official Spirit | $ 50,000 |
| Chef Demo | $ 35,000 |
| Ferris Wheel | $ 35,000 |
| Official Credit Card | $ 35,000 |
| Official Juice | $ 25,000 |
| Official Water | $ 25,000 |
| Participating (Vending) | $ 22,500 |
| Participating (Non–Vending) | $ 20,000 |

38. In 1996, Sears paid the City $275,000 to be the sole and exclusive sponsor of the Taste of Chicago among retail, department or discount stores offering merchandise similar to any segment of Sears' businesses. See Sponsorship Agreement between the City and Sears dated April 26, 1996, at ¶ 3.06. (Dx 21a).

39. The City introduced a report prepared by McKeen & Associates which analyzed the economic impact of the summer festivals on Chicago's economy. (Dx 13). Taste of Chicago generates significant revenues for the City, both directly and indirectly. Approximately thirty-six percent of those attending Taste of Chicago came from the Chicago suburbs and twenty-one percent came from outside the Chicago metropolitan area. The 1996 total economic impact of Taste of Chicago on the Chicago economy from these two groups was $118,411,044.18. In 1996, Taste of Chicago generated net revenues of over $12,000,000 and generated over $1,000,000 in profit to the City which was used to finance a number of activities throughout the City. (Dx 14).

## Chicago Blues Festival

40. The Chicago Blues Festival is the largest of Chicago's music festivals. The Chicago Blues Festival plays host to national and international performers. Corporate sponsorships are sold at prices ranging from $15,000 to $150,000.

41. The total economic impact for the 1996 Chicago Blues Festival from suburban and midwest visitors was $54,877,683.00. (Dx 13).

## Chicago Gospel Festival

42. The Chicago Festival has become the largest free gospel celebration in the world. Corporate sponsorships are sold at prices ranging from $10,000 to $125,000.

43. The total economic impact for the 1996 Chicago Gospel Festival from suburban and midwest visitors was $2,755,778.20. (Dx 13).

## Chicago Jazz Festival

44. The Chicago Jazz Festival is the oldest of the City's summer music festivals, and attracts jazz enthusiasts from around the world. This event is produced by the Jazz Institute of Chicago, a not-for-profit organization dedicated to the preservation and perpetuation of jazz in all its forms. Corporate sponsorships are sold at prices ranging from $12,500 to $140,000.

45. The total economic impact for the 1996 Chicago Jazz Festival from suburban and midwest visitors was $15,478,467.46. (Dx 13).

## Chicago Viva Festival

46. Chicago Viva Festival is a showcase of Latin culture and music. Corporate sponsorships are sold at prices ranging from $10,000 to $125,000.

47. The total economic impact for the 1996 Chicago Viva Festival from suburban and midwest visitors was $2,318,927.50. (Dx 13).

## Sponsorship Agreements

48. For each City-sponsored festival at Grant Park, the City enters into a sponsorship agreement. (Dx 21a and b). Under the sponsorship agreement, the sponsor agrees, *inter alia,* to: pay the City a certain sum of money; provide the City with a written plan of promotional activities, corporate logo of the sponsor and press releases; provide workers compensation and occupational disease insurance; provide commercial general liability insurance; provide automobile liability insurance; provide all risk property insur-

ance; and provide self insurance. In return, the City designates the corporation as a specified sponsor of the event, includes the sponsor's name and logo in advertising the event, provides the sponsor with reasonable opportunities for sampling and on-site promotion at the event in accordance with a written plan.

49. The City also leases out booth space to contractors, who operate the official food and merchandise concessions at the festivals. Contractors expend large sums of money for the right to operate concessions at the festivals. For example, restaurants participating in the 1996 Taste of Chicago each paid the City $2,500 plus a percentage of their revenue to rent booths at the festival.

50. The money the sponsors and vendors pay the City assists the City in financing each festival. Taste of Chicago provides the main source of financing the other festivals.

**Souvenir Vendor Agreement**

51. The City selects a concessionaire to provide souvenirs at the City-sponsored festivals in Grant Park. The selection process for this contract begins with the City issuing a request for proposals for the exclusive souvenir concessions. (Dx 33).

52. In 1996, the Souvenir Vendor Agreement was awarded to Accent Chicago, Inc. ("Accent Chicago"). (Dx 34). Under this agreement, Accent Chicago paid the City a flat fee of $110,000.00, plus twenty percent of all vendor sales in excess of $550,000 after the payment of sales taxes.

53. The City has extended for one year its agreement with Accent Chicago. The contract commences on May 15, 1997 and concludes on May 14, 1998. Accent Chicago will pay the City a flat fee of $114,000.00, plus twenty percent of vendor sales that exceed $550,000 after the payment of sales taxes. Karen Kline, President of Accent Chicago, testified that her company sells T-shirts, tank tops, sweatshirts, tote bags, post cards, film and other souvenirs at the festivals. Approximately 75% of its business was in T-shirts. She is concerned that MPAC T-shirts might compete with her official merchandise. The Court finds that MPAC T-shirts do not offer any meaningful competi-

tion to Accent Chicago because MPAC T-shirts are likely to be purchased by a very tiny percentage of those who are interested in souvenir T-shirts and will likely be purchased only by those who agree with the controversial message it conveys. The City has failed to prove financial harm exists to the City or to Accent Chicago by permitting MPAC T-shirts to be sold at the festivals.

**The City's Contractual Arrangements With The Chicago Park District**

54. The Chicago Blues Festival, Taste of Chicago, Chicago Gospel Festival, Chicago Jazz Festival and Chicago Viva Festival are held in portions of Grant Park.

55. The Chicago Park District ("Park District") holds exclusive title to exercise control over and supervise the operation of Grant Park. 70 ILCS 1505/26.10–1 (1994) (the "territory known as Grant Park shall be under the jurisdiction of the Chicago Park District"); *see also id.* at 1545/3.

56. For the Taste of Chicago, the City contracts with the Park District to use a sixty acre portion of Grant Park bounded by Michigan Avenue, Monroe Street, Lake Shore Drive and Balbo Drive, which includes the use of the Petrillo Band Shell ("Taste Festival Area"). (Dx 20a-d). The Chicago Park District also waives its concession activities in the Taste Festival Area.

57. For Chicago Blues Festival, the City contracts with the Park District to use a portion of Grant Park bounded by Columbus Drive, Monroe Street, Lake Shore Drive and to Congress Parkway and to buy out the Park District's concession agreements.

58. For the Chicago Jazz Festival, the City contracts with the Park District to use a portion of Grant Park bounded by Columbus Drive, Monroe Street, Lake Shore Drive and Jackson Boulevard and to buy out the Park District's concession agreements.

59. In 1996, the City paid the Chicago Park District $275,000 for the use of portions of Grant Park and the suspension of the Park District's concession operations for the Chicago Blues Festival, Chicago Jazz Festival and Taste of Chicago.

60. Unless specifically stated, the Park District has no control or authority over the Festivals' content, production or operation. (Dx 20d).

61. The Chicago Gospel Festival and Chicago Viva Festival are held in a portion of Grant Park bounded by Columbus Drive, Monroe Street, Lake Shore Drive and Jackson Boulevard. There is no written agreement between the City and the Chicago Park District for these festivals.

### D. Reason For Preliminary Injunction Hearing.

62. The reason for the preliminary injunction hearing is quite simple. Plaintiff desires to sell MPAC T-shirts at the City festivals which begin on June 5. The City has indicated that Plaintiff will be ticketed and prevented from selling MPAC T-shirts if she attempts to do so. The preliminary injunction proceeding is limited to the issue of Plaintiff's right to sell MPAC T-shirts at the City-sponsored festivals and does not address the right of Plaintiff to sell MPAC T-shirts at other sites prohibited by the Peddlers' Ordinance. Furthermore, although this action was filed as a class action, no class determination has yet been made. The motion for preliminary injunction is being prosecuted by Plaintiff on an individual basis, not as a class.

### CONCLUSIONS OF LAW

### IV. PRELIMINARY INJUNCTION STANDARD.

63. The Supreme Court in *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311–2, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) explained the nature and circumstances for the issuance of injunctive relief as follows:

> It goes without saying that an injunction is an equitable remedy. It "is not a remedy which issues as of course," [cites omitted], or "to restrain an act the injurious consequences of which are merely trifling." [cites omitted]. An injunction should issue only where the intervention of a court of equity "is essential in order effectually to protect property rights against injuries otherwise irremediable." [cites omitted].

The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies. [cites omitted].

64. Whether a preliminary injunction should be granted by a district court generally involves a four-part analysis. The district court begins by considering whether the moving party has demonstrated: 1) a reasonable likelihood of success on the merits, and 2) no adequate remedy at law and irreparable harm if preliminary relief is denied. If the moving party clears these hurdles, the court must then consider: 3) the irreparable harm the non-moving party will suffer if the injunction is granted balanced against the irreparable harm the moving party will suffer if the injunction is denied, and 4) the public interest, i.e., the effect that granting or denying the injunction will have on non-parties. *Mil–Mar Shoe Co. Inc. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir.1996).

### V. BURDEN OF PROOF.

65. The City bears the burden of justifying its restrictions on Plaintiff's right to free speech. *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 3035, 106 L.Ed.2d 388 (1989); *Graff v. City of Chicago*, 9 F.3d 1309, 1322 (7th Cir.1993).

### VI. FIRST AMENDMENT ANALYSIS.

### A. The First Amendment is Applicable to the City of Chicago.

66. The First Amendment states:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; *or abridging the freedom of speech*, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. (Emphasis supplied).

This case involves one of this country's most important values, freedom of speech.

67. Freedom of speech has been characterized as "... the matrix, the indispensable condition of nearly every other form of free-

dom." *Palko v. Connecticut,* 302 U.S. 319, 327, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937).

68. The Fourteenth Amendment makes the First Amendment applicable to the States, see *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), and to their political subdivisions, see *Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

## B. Plaintiff's Activities are Protected by the First Amendment.

69. In determining whether the Peddlers' Ordinance is constitutional, the Court must first determine whether Plaintiff is engaged in First Amendment protected activities. Although the First Amendment refers to "freedom of speech," it is undisputed that the Constitution protects more than oral expression. The Supreme Court has found words written on clothing, *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) and black arm bands worn to protest the Vietnam War, *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 505–06, 89 S.Ct. 733, 735–36, 21 L.Ed.2d 731 (1969), to be protected by the First Amendment. The Plaintiff is selling T-shirts advocating the legalization of marijuana. The sale of T-shirts advocating political change is clearly protected by the First Amendment. See, *Friends of the Vietnam Veterans v. Kennedy,* 899 F.Supp. 680 (D.D.C.1995) (T-shirts attempting to raise plight of MIAs and POWs in Vietnam is protected by the First Amendment).

70. The City argues that Plaintiff's activities should be governed by a lesser standard of protection because she sells her T-shirts. This argument has been rejected by the Supreme Court which has made it clear that the degree of First Amendment protection is not diminished merely because the form of speech is sold rather than given away. See, *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973); *Gaudiya Vaishnava Society v. City and County of San Francisco,* 952 F.2d 1059, 1066 (9th Cir.1990) ("We hold that when nonprofits engage in activities where pure speech and commercial speech are inex-

tricably intertwined the entirety must be classified as fully protected noncommercial speech.") The Court holds that Plaintiff's sale of T-shirts advocating reform of the marijuana laws is protected by the First Amendment as non-commercial speech.

## C. Grant Park is a Traditional Public Forum.

71. The First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired. *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2259, 2563–64, 69 L.Ed.2d 298 (1981). The Supreme Court in *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–955, 74 L.Ed.2d 794 (1983), divided forums for the purpose of First Amendment analysis into three types: traditional public forums, limited public forums and non-public forums. Plaintiff contends that during the City-sponsored festivals Grant Park is a traditional public forum. The City contends that because it has leased the park from the Park District and is primarily engaged in a commercial enterprise during the festivals that Grant Park should be viewed as a limited public forum. The City further argues that the vendor booths should be considered non-public forums.

72. Traditional public fora are places "which by long tradition or by government fiat have been devoted to assembly and debate." *Perry,* 460 U.S. at 45, 103 S.Ct. at 954. At one end of the spectrum are streets and parks which "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939).

73. A limited public forum consists of property which the state has opened for use by the public as a place for expressive activity. *Perry,* 460 U.S. at 45, 103 S.Ct. at 955. Examples of limited public fora include university meeting facilities, *Widmar v. Vin-*

*cent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), school board meetings, *City of Madison Joint School District No. 8 v. Wisconsin Public Employment Relations Comm'n,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) and a municipal theater, *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. During the City-sponsored festivals, Grant Park is open for expressive activity. In fact, the City argues that Plaintiff is free to engage in alternative forms of expressive activity such as leafletting, giving away T-shirts and making speeches. Therefore, the question of whether Grant Park is to be treated as a traditional public forum or a limited public forum is not of major significance because the same standard applies. However, the Court does find that the park land and public sidewalks which are the site of City-sponsored festivals do constitute traditional public forums for purposes of First Amendment analysis.

### D. The Peddlers' Ordinance is Content Neutral.

74. Having determined that a traditional public forum is involved, the next issue is whether the Peddlers' Ordinance is content-based or content-neutral. Plaintiff contends that the ordinance is content based because not all commercial activity is being prohibited. The City contends that the Peddlers' Ordinance is content-neutral. The determination of whether the ordinance is content-neutral is significant because it determines the standard to be applied in deciding the constitutionality of the challenged regulation. In order for the City to enforce a content-based exclusion, it must show its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. *Perry,* 460 U.S. at 45, 103 S.Ct. at 955. With respect to a content-neutral ordinance, the state may regulate the time, place and manner of expression which is narrowly-tailored to serve a significant government interest and leave open ample alternative channels of communication. *Id.*

75. The principal inquiry in determining content neutrality, in speech cases generally and in time, place or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989). The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. *Id.* The Peddlers' Ordinance is content neutral. It bars all peddling in certain areas of the city without regard to the type of peddling involved. The Peddlers' Ordinance applies equally to all merchandise of any kind which is sought to be brought into City-sponsored festivals without regard to whether it contains a message or the content of the message. Cubs T-shirts, Sox T-shirts and pro and anti-Mayor Daley T-shirts are banned to the same extent as MPAC T-shirts if they are brought in for sale. The Peddlers' Ordinance is content-neutral.

### E. The Peddlers' Ordinance is Not Narrowly Tailored As Applied To Plaintiff's First Amendment Protected Activity.

76. The Supreme Court has provided the following guidelines for this Court to follow in analyzing whether a content-neutral ordinance is narrowly tailored to serve the City's legitimate, content-neutral interests. First, the Court must identify and analyze the City's content-neutral interests. Second, the City need not adopt the least restrictive or least intrusive means of accomplishing its objective. *Ward,* 491 U.S. at 798, 109 S.Ct. at 2757. The requirement of narrow tailoring is satisfied "so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985). Third, this standard does not mean that the

ordinance may burden substantially more speech than is necessary to further the government's legitimate interests. The ordinance may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals. Therefore, a complete ban can be narrowly tailored if each activity barred by the ordinance is an appropriately targeted evil. *Frisby v. Schultz*, 487 U.S. 474, 485, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988). Finally, so long as the means chosen are not substantially broader than necessary to achieve the government's interest, the ordinance will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative. *Ward,* 491 U.S. at 799, 109 S.Ct. at 2758.

77. The City relies upon three interests, which the Court will examine in turn: 1) the aesthetic appearance of Chicago's central district by avoiding the visual blight associated with hordes of peddlers attempting to hawk their goods on the public ways; 2) the City's interest in assuring the safe and convenient circulation of pedestrians on the public ways; and 3) the City's interest in protecting local merchants or approved vendors from unfair competition.

78. The Court recognizes that in analyzing these issues, the inquiry must involve not only Plaintiff and other MPAC members, but also all other organizations that would be entitled to sell First Amendment protected expressive materials at the festivals. *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 654, 101 S.Ct. 2559, 2567, 69 L.Ed.2d 298 (1981).

**Aesthetics**

79. The aesthetic implications of the Peddlers' Ordinance as it may relate to the central business district and areas such as State Street and Michigan Avenue is not currently before the Court with respect to the motion for a preliminary injunction. Therefore, the City's reliance upon *One World One Family Now v. City and County of Honolulu,* 76 F.3d 1009 (9th Cir.1996), which upheld an ordinance prohibiting the sale of merchandise on commercial city streets is not on point. In that case, the Court was not faced

with the issue of expressive content at a festival in a public park where the aesthetics are wild and colorful, where no vehicular traffic is permitted and where aesthetics appear to be of little concern. (Dx 24d and 32). The City has failed to meet its burden of proving how barring Plaintiff and MPAC from selling expressive T-shirts at City-sponsored festivals impacts aesthetics. Because the City does not contest her right to wear or give away the T-shirts, if she could afford to do so, the Court can see no aesthetic benefit in barring her from selling these same shirts.

**Safe and Convenient Circulation of Pedestrian Traffic**

80. The City acknowledges that Plaintiff and other organizations are currently free to circulate through the park during the festivals. The City has failed to prove that the complete barring of Plaintiff's sale activities is essential to promote pedestrian traffic flow. The City makes provision for street performers to appear at City festivals even though they attract crowds which might impede traffic. The City has also made provisions for local artists to have designated areas where they can sell their art without impeding the flow of pedestrian traffic. The City makes provision for vendor tents, ferris wheels, water flumes and hundreds of port-a-potties without impeding the flow of traffic. Under these circumstances, the Court finds that the ordinance burdens substantially more speech than is necessary to further the City's interest in preserving orderly pedestrian traffic. The Court notes that the Supreme Court in *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) upheld a Minnesota state fair rule which confined religious organizations desiring to sell religious literature and to solicit donations at a state fair to assigned locations within the fairgrounds. The Court upheld the rule as a valid time, place and manner restriction.

**Protecting Approved Vendors From Unfair Competition.**

81. The City argues that the ordinance is necessary to protect its approved souvenir vendor from unfair competition. The Court

finds that the City has failed to prove that the complete barring of Plaintiff's sales activities is essential to promote this purpose. The City's concern that Plaintiff's T-shirts, which advocate reform of the marijuana laws, may be confused with officially licensed festival T-shirts, does not require a complete sales ban on Plaintiff. The MPAC T-shirt is not in competition with an official Taste of Chicago or Chicago Blues Festival T-shirt any more than a high school basketball game is in competition with the Chicago Bulls for the consumers' money. (Px 14, Dx 35a, 38 and 41). These T-shirts appeal to different "tastes." The City could designate a site and require Plaintiff to make it clear that MPAC T-shirts are not officially sponsored merchandise. Furthermore, the City's argument that the sale of MPAC T-shirts compete with officially licensed T-shirts is undercut by the City's argument that Plaintiff is free to give the T-shirts away but should be barred from selling them. Clearly, a free T-shirt would offer greater competition to official T-shirts than those that are sold.

82. In *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), the Supreme Court struck down a billboard ordinance which afforded greater protection to commercial speech than non-commercial speech. In that case, the ordinance permitted onsite commercial advertisements, but not noncommercial ads. Similarly, at the City festivals, the City has promoted substantial commercial speech, with all of the sponsors and official souvenir stands, but seeks to prohibit non-commercial sales of merchandise. In language equally applicable to this case, the Court held: "Insofar as the City tolerates billboards at all, it cannot choose to limit their content to commercial messages; the City may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages." 453 U.S. at 513, 101 S.Ct. at 2895. This rationale is even stronger where a traditional public forum such as Grant Park is involved.

83. The Court finds that the Peddlers' Ordinance burdens substantially more ex-

pressive speech than is necessary to further the city's interest in protecting its approved vendors from unfair competition. The Court also finds that Plaintiff's prior ten-year history of selling MPAC T-shirts at City festivals has not caused vendors to shy away from applying to become the officially approved souvenir vendor.

## F. The Ordinance Does Not Leave Open Ample Alternative Channels for Communication of Plaintiff's Message.

84. The final inquiry in evaluating whether the Peddlers' Ordinance constitutes a reasonable time, manner and place restriction is to determine whether the Peddlers' Ordinance leave open ample alternative channels for communication of the information. *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983). In analyzing this issue the Court recognizes that each medium of expression must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975); *Graff v. City of Chicago*, 9 F.3d 1309, 1315 (7th Cir.1993) (newsstands).

85. Plaintiff contends that the Peddlers' Ordinance as applied to City-sponsored festivals does not leave open ample channels of communication for a number of reasons: 1) she cannot afford to give the T-shirts away; 2) the crowds at the City-sponsored festivals contain many young people and others who she believes would be receptive to MPAC's message; 3) leafleting, carrying signs, wearing sign boards or T-shirts are not as effective as being able to enlist members by selling and having the buyers wear the T-shirts; and 4) the Ordinance bans her from selling in a several mile radius surrounding Grant Park.

86. The City counters by arguing that Plaintiff is free to communicate her message in other ways including: 1) wearing her T-shirt; 2) wearing a sandwich board; 3) giving away T-shirts; 4) carrying signs; 5) leafleting; 6) proselytizing; 7) broadcasting her message on radio and television; 8) holding events to disseminate her message; and 9)

selling her T-shirts through commercial outlets. Plaintiff is free to engage in the first six of these activities at the festivals and the City argues this should be sufficient.

87. This issue requires the Court to consider the nature of T-shirts and the role T-shirts play in the ability of Plaintiff and MPAC to communicate their message encouraging the legalization of marijuana. In *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), the Supreme Court struck down a peddlers' ordinance which prevented Jehovah's Witnesses from going door to door to distribute literature and to go door to door selling religious books and pamphlets. The Supreme Court observed that the hand distribution of religious tracts is an age-old form of missionary evangelism which is protected by the First Amendment.

88. As we fast forward to the latter third of the 20th Century, the Court finds that T-shirts have become a significant medium of communicating political ideas and political protest. As Professor John Tarini, Chairman of the Marketing Communications Department at Columbia College testified, T-shirts have become a media unto themselves beginning approximately 25 years ago when processes were developed to make them inexpensive to imprint. Unlike earlier times, T-shirts are worn as outer clothing to demonstrate an identification by an individual with an entity or a cause, whether it is the Chicago Bulls, Taste of Chicago, Pro–Life, Clinton or Dole for President or the legalization of marijuana. According to Dr. Tarini, T-shirts are purchased primarily for their psychological value because there is "very little intrinsic value in the T-shirt beyond the two bucks of the cloth." (Tr. 5/21/97, p. 165). He testified that the MPAC T-shirt has psychological value. A party who purchases it tends to agree with MPAC's position, is willing to give money for the cause and is willing to promote the idea by wearing the T-shirt. Furthermore, festivals provide an efficient location for Plaintiff to reach her target audience and is a much more effective way of gaining exposure for her cause than leafletting or carrying signs. Approximately one-half of Plaintiff's T-shirt sales take place at City-sponsored festivals. The fact that a person is willing to part with money in exchange for the T-shirt also indicates a possible agreement with the agenda MPAC is promoting. Plaintiff is also more likely to be able to engage people in conversation and to sell her T-shirts in a festival environment than going door to door or stopping people on the way to or from work on the street. Furthermore, face to face communication is the most effective form of communication because the speaker can tailor her message depending upon the receptiveness of the person interacting with her.

89. Plaintiff testified that she founded MPAC over ten years ago. MPAC does not maintain a membership list because many members fear that it might come into possession of a drug enforcement agency. During the past ten years she has sold over 20,000 T-shirts. With the proceeds, the organization makes T-shirts, contacts politicians, conducts festivals and brings in speakers to promote the legalization of marijuana. The T-shirts are the primary and most effective means of financing MPAC's activities and promoting its message. The Court finds that the sale of T-shirts is a vital means by which Plaintiff communicates MPAC's message and that T-shirts represent a form of expressive speech protected by the First Amendment and is not simply commercial speech.

90. The City relies upon three recent cases to support its Peddlers' Ordinance. In *One World One Family v. City and County of Honolulu*, 76 F.3d 1009 (9th Cir.1996), the Court upheld a peddling ban which prohibits the sale of merchandise on city streets. The case at bar is distinguishable because we are dealing with a public park. In a statement with which this Court respectfully disagrees, the majority stated "While selling T-shirts is a unique form of expression in the sense that serving message-bearing raviolis or preaching on street corners in a Donald Duck voice would be unique, it does nothing to make the message uniquely significant or effective." 76 F.3d at 1015. This Court factually finds to the contrary. Furthermore, the Court believes that the dissent in that case properly applies the Supreme Court precedent and

the rationale which the Seventh Circuit would adopt.

91. The City's reliance upon *ISKCON of Potomac v. Kennedy,* 61 F.3d 949 (D.C.Cir. 1995) (upholding Park Service regulation prohibiting the sale of merchandise, including T-shirts at Vietnam Memorial) and *Perry v. City of Chicago,* 480 F.Supp. 498 (N.D.Ill. 1979) (upholding peddling restriction in Chicago) is also nonpersuasive. In *ISKCON,* the regulation was intended in part to preserve the general ban on sales to maintain the mall which is "essentially free of commercialism." 61 F.3d at 957. By contrast, the festivals seek to promote commercialism in Grant Park. The case involved a ban on audio tapes and beads and not T-shirts.

92. *Perry v. City of Chicago,* 480 F.Supp. 498, 504 (N.D.Ill.1979) is distinguishable because plaintiff in that case "has not identified what it is he desires to communicate or how the City's peddling restrictions impinge his ability to communicate." That case did not implicate the same First Amendment issues presented by Plaintiff where Plaintiff has consistently sought to promote a controversial political cause for over ten years.

93. The Court finds the reasoning and conclusions reached in *Friends of the Vietnam Veterans Memorial v. Kennedy,* 899 F.Supp. 680 (D.D.C.1995) to be consistent with the Supreme Court's interpretation of the First Amendment. There, the Court found that the message-bearing T-shirt is a unique and especially effective means of communicating the plaintiff's point of view to raise public awareness about POW/MIAs from the Vietnam War. 899 F.Supp. at 684. This Court makes a similar finding with respect to MPAC T-shirts. Second, the Court found that the sale of T-shirts is the primary source of funds that enable these groups to continue to engage in their First Amendment activities. 899 F.Supp. at 684. This is also true regarding MPAC. "In some ways, message bearing T-shirts serve the same purpose as the pamphlet did when this country was merely a British colony." *Id.*

94. Plaintiff's case is stronger than the *Friends of the Vietnam Veterans Memorial* case because in that case the Park Service sought to justify the regulation in order to eliminate discordant and excessive commercialism on federal land and the resulting degraded aesthetic values. As defendants exhibits 9, 24a(1), 24b, 24d, 27a(1) and 32 make clear, commercialism reigns supreme in Grant Park during the festivals and aesthetics values are not anywhere to be found.

■ 95. In addition, the Court concludes that other cases striking down ordinances which totally ban the sale of message bearing T-shirts in public forums to be more in keeping with the Supreme Court's First Amendment precedent than the cases relied upon by the City. See e.g., *Gaudiya Vaishnava Society v. City and County of San Francisco,* 952 F.2d 1059 (9th Cir.1990) (enjoining San Francisco from enforcing ordinance which prohibited the sale of message bearing T-shirts in Fisherman's Wharf or Union Square areas of San Francisco because no explicit limits are placed on the Chief of Police's discretion). Although the *Gaudiya* holding rests on a different rationale, the Court held that T-shirts that convey core First Amendment messages (political, religious and philosophical) should be accorded full protection under the First Amendment regardless of whether they are sold or given away. 952 F.2d at 1063. This Court agrees. See also, *Milwaukee Mobilization for Survival v. Milwaukee County Park Commission,* 474 F.Supp. 881 (E.D.Wis.1979) (granting preliminary injunction to prevent county from enforcing ordinances which would ban plaintiff from selling T-shirts, buttons, bumper stickers and other political paraphernalia at a political rally to be held in a public park); *One World One Family Now, Inc. v. State of Nevada,* 860 F.Supp. 1457 (D.Nev.1994) (granting preliminary injunction which allows plaintiffs to set up portable tables and signs to sell message bearing T-shirts and other merchandise on public sidewalks); *One World One Family Now v. City of Key West,* 852 F.Supp. 1005 (S.D.Fla.1994) (granting preliminary injunction to permit the sale of expressive T-shirts from portable tables in the historic district of Key West).

## G. Plaintiff Has Demonstrated A Strong Likelihood of Success On the Merits.

96. Plaintiff has demonstrated a strong likelihood of success on the merits. The

Peddlers' Ordinance is content-neutral. The City may regulate the time, place and manner of expression which is narrowly-tailored to serve a significant government interest, and leaves open ample alternative channels of communication. The Peddlers' Ordinance is not narrowly tailored because it substantially burdens more speech than is necessary to further the government's legitimate interest. The Peddlers' Ordinance does not leave open ample alternative channels of communication because: 1) the Ordinance prevents her from selling T-shirts for a several mile radius surrounding Grant Park; 2) T-shirts are unique and are an especially effective means of communicating Plaintiff's point of view concerning the legalization of marijuana; and 3) T-shirts represent the primary source of funds that enable Plaintiff and MPAC to engage in their First Amendment activities. Therefore, the Court holds that the Peddlers' Ordinance is unconstitutional as applied to Plaintiff's efforts to sell MPAC T-shirts during City sponsored festivals in Grant Park. The Court does not hold that the Peddlers' Ordinance is facially defective.

## VII. PLAINTIFF HAS DEMONSTRATED A THREAT OF IRREPARABLE HARM.

97. In First Amendment cases, once a likelihood of success on the merits has been established, irreparable harm necessarily follows. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976).

## VIII. THE BALANCE OF HARDSHIPS TIPS IN THE PLAINTIFF'S FAVOR.

98. Preventing Plaintiff from engaging in her First Amendment protected activities creates a greater harm to Plaintiff than it does to the City, which has seen its festivals thrive even with Plaintiff's presence in Grant Park over the past ten years. The City argues that allowing Plaintiff to sell MPAC T-shirts at the City-sponsored festivals will result in a plethora of groups descending on Grant Park to sell T-shirts for a myriad of causes, resulting in congestion and unfair competition. However, Mr. Sheahan stated that in the years preceding the City's Peddlers' Ordinances various groups attempted to solicit at the festivals and were unsuccessful. According to Mr. Sheahan, people come to Grant Park to enjoy either the food or music being offered and were not interested in political or charitable causes. MPAC relies heavily on the festivals to publicize and fund raise for its cause. The balance of hardships tips greatly in Plaintiff's favor. The City remains free to adopt new ordinances or regulations consistent with the First Amendment.

## IX. THE GRANTING OF THE INJUNCTION WILL NOT DISSERVE THE PUBLIC INTEREST.

99. The First Amendment reflects a "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust and wide open." *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). The Supreme Court has recognized that speech concerning public affairs is more than self-expression, it is the essence of self government. *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964). It is not free thought for those who agree with us, but freedom for the thought we hate which embodies the essence of this touchstone of individual liberty. *Collin v. Chicago Park District*, 460 F.2d 746 (7th Cir.1972) (holding that Nazis were entitled to hold a rally in Marquette Park). The public interest is clearly served by strong and vigorous protection of the First Amendment. The granting of the injunction will not disserve, but rather promote, the public interest. *O'Brien v. Town of Caledonia*, 748 F.2d 403, 405 (7th Cir.1984).

## X. A NOMINAL BOND IS APPROPRIATE

100. Plaintiff has limited financial resources and MPAC is a not-for-profit unincorporated association. Plaintiff is unable to post a significant bond. The Court can foresee no damages to the City in the event the Court has erred in granting the injunction. Under the circumstances the Court finds that a nominal bond of ten dollars is appropriate.

*Coyne–Delany Co., Inc. v. Capital Development Board of State of Illinois,* 717 F.2d 385, 391 (7th Cir.1983).

## XI. CONCLUSION.

101. The Peddlers' Ordinance is unconstitutional as applied to Plaintiff's efforts to sell MPAC T-shirts at City sponsored festivals in Grant Park. Plaintiff's Motion for a Preliminary Injunction is granted.

\* \* \* \* \* \*

### PRELIMINARY INJUNCTION ORDER

**IT IS HEREBY ORDERED** that pending a final trial on the merits or further order of the Court:

A. The City of Chicago, its agents, officers, servants, employees, independent contractors, and any others in active concert or participation with any of them who receive actual notice of this order by personal service or otherwise are enjoined from enforcing the Peddlers' Ordinance, Municipal Code of Chicago §§ 4–244–010 through § 4–244–170, with respect to the sale by Plaintiff, and her agents, of MPAC T-shirts at the City-sponsored festivals held in Grant Park in the area leased or used by the City for these festivals.

B. Plaintiff shall post a nominal bond in the amount of ten dollars ($10.00) with the Clerk of the Court to secure the payment of such costs and damages as may be suffered or sustained by any party who may be wrongfully restrained by this Preliminary Injunction.

C. Based on the limitations expressed by Plaintiff's counsel and the prior ten year history of dealings between the parties: 1) Plaintiff shall limit the number of MPAC representatives who are engaged in the sale of MPAC T-shirts at City-sponsored festivals in Grant Park to no more than five persons at any one time; 2) Plaintiff and other MPAC representatives shall report to the City's Command Post at the Festival site to identify themselves prior to commencing their sale activities; and 3) Plaintiff shall indicate in some visible manner that the MPAC T-shirts are not officially sponsored by the City.

D. This Preliminary Injunction Order shall not be construed by any party to enjoin the City from enforcing any other lawful ordinances, including safety ordinances, with respect to Plaintiff and her agents.

E. This Preliminary Injunction Order is limited solely to any attempts by the City to require Plaintiff and her agents to comply with the City's Peddlers' Ordinance with respect to their efforts to sell MPAC T-shirts during City-sponsored festivals in Grant Park.

F. The parties are encouraged to meet to determine mutually agreeable times and locations on the festival grounds from which Plaintiff and MPAC may conduct its MPAC T-shirt sales, similar to efforts the City currently uses with street performers who appear at the festivals.